UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| SCOTT WILKINSON, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>RICK TORRES, et al.,<br><br>    Defendants. | CASE NO. C08-5281BHS<br><br>ORDER DENYING OFFICER TORRES' MOTION FOR SUMMARY JUDGMENT AND GRANTING OFFICER KEY'S MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Defendant Torres' Motion for Summary Judgment (Dkt. 25) and Defendant Key's Motion for Summary Judgment (Dkt. 28). The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and hereby denies Torres' motion without prejudice and grants Key's motion for the reasons stated herein.

## I. PROCEDURAL BACKGROUND

On May 2, 2008, Plaintiffs Scott Wilkinson, Alisha White, and the Estate of Jason Scott Wilkinson filed a complaint against Defendants Rick Torres, John Key, Brian Martinek, the City of Vancouver, and John and Jane Does 1-20. Dkt. 1. At all times material to the complaint, Defendants Rick Torres and John Key were police officers for the City of Vancouver. *Id*. ¶ 2.3.

Plaintiffs allege the following claims against Defendant Torres:

> Defendant Torres' actions violated decedent's right to be free from summary execution and punishment and deprivation of life and liberty without due process of law under the Fifth and Fourteenth Amendments to the United States Constitution, to be free from unreasonable search and seizure under the Fourth and Fourteenth Amendments and to feely [sic]

ORDER - 1

associate with family and friends under the First and Fourteenth
Amendments.

*Id.*, ¶ 6.7.

Plaintiffs allege the following claim against Defendant Key:

> KEY was present when TORRES used the unreasonable, excessive, and deadly force, KEY knew or should have known TORRES was using unreasonable, excessive, and deadly force, and had the ability to intercede and prevent the continued use of said force; however, KEY stood by, neglected to make any effort to stop or intercede in the unconstitutional force, and explicitly and/or tacitly approved of TORRES' use of deadly force.

*Id.*, ¶ 7.2.

On November 7, 2008, Defendant Torres filed a Motion for Partial Summary Judgment. Dkt. 25. On December 2, 2008, Plaintiffs responded and included a motion to strike Defendant's references to Jason Wilkinson's Death Investigation Toxicology Report and to his criminal history. Dkt. 43. On December 5, 2008, Defendant Torres replied and included a motion to strike material Plaintiffs submitted in support of their response. Dkt. 47.

On November 7, 2008, Defendant Key filed a Motion for Summary Judgment. Dkt 28. On December 15, 2008, Plaintiffs responded and included a motion to strike the Declaration of Colleen Lines (Dkt. 34). Dkt. 49. On December 19, 2008, Defendant Key replied. Dkt. 51.

## II. FACTUAL BACKGROUND

On May 8, 2005, Vancouver Police Officer John Key identified a stolen minivan with an unidentified driver inside the vehicle. Dkt. 30, Declaration of John Key ("Key Decl."), Exh. A, Interview of John Key ("Key Interview") at 4-5. After Officer Key yelled at the driver, the driver started the van and drove away from the scene. *Id.* at 5-6. Officer Key informed his dispatcher that the minivan "took off" and initiated a pursuit of the vehicle. *Id.* at 6.

Officer Rick Torres heard Officer Key's communications over the radio and became concerned about the situation. Dkt. 36, Declaration of Rick Torres ("Torres

ORDER - 2

Decl."), Exh. A, Interview of Rick Torres ("Torres Interview") at 5-6. At the time Officer Key radioed that the stolen van had driven away, Officer Torres claims that he was approximately six blocks away from Officer Key's location. *Id*. at 6-8. After Officer Key radioed the direction of the pursuit, Officer Torres waited at an intersection to intercept Officer Key and the van. *Id*. Officer Torres saw both vehicles approaching at a speed that wasn't over the speed limit. *Id*. He had his lights on and saw that Officer Key also had his lights on behind the van. *Id*. Both the van and Officer Key passed Officer Torres and Officer Torres joined the pursuit. *Id*. at 8-9.

It is undisputed that Officers Key and Torres followed the van for approximately three minutes over a distance of approximately two miles. Officer Torres claims that the pursuit proceeded at speeds of "maybe 10 miles over" the speed limit. *Id*. at 11. Officer Torres also claims that Officer Key encouraged him to perform a Pursuit Immobilization Technique ("PIT") on the van when he had the opportunity. *Id*. Defendant Torres states that a PIT is a recently developed law enforcement procedure where an "police officer places his vehicle parallel and a bit behind the suspect vehicle, and bumps the rear quarter panel with the front quarter panel of his vehicle sending the suspect vehicle into a spin." Dkt. 25 at 4.

As the van and Officer Torres approached the intersection of NE 49th St. and NE 40th Ave., Officer Torres decided that the intersection would be the "best spot to take him." Torres Interview at 12. When Officer Torres hit the van, the van spun 90 degrees. *Id*. at 13-14. Officer Torres claims that the van attempted to "take off again" so he hit the van again. *Id*. at 14. After the second hit, the van spun off the road into a side yard. *Id*. at 15. As the van continued driving through the yard, Officer Torres stopped and exited his vehicle. *Id*. at 15-16. He claims that he saw the van attempt to maneuver through numerous trees in the yard and eventually hit a telephone pole. *Id*. at 16. Thomas Fries, a Traffic Accident Reconstructionist obtained by Plaintiffs, claims that the van "entered the yard, at an assumed speed of 10-12 mph, leaving tire marks for about 75 feet." Dkt. 46,

Declaration of Thomas Fries ("Fries Decl."), ¶ 2(b). Mr. Fries also concludes that the van "impacted the telephone pole at 12-15 mph." *Id.* ¶ 2(c).

Clark County Deputy Sheriff Scott Shanaker was on patrol that day in the area of the pursuit. Dkt. 27, Declaration of Scott Shanaker, Exh. A, Interview of Scott Shanaker ("Shanaker Interview"), at 1-2. Deputy Shanaker heard the pursuit over the radio and proceeded to drive toward the pursuit. *Id.* He eventually reached the vehicles and saw Officer Torres' PIT maneuver from a distance. *Id.* at 3. He briefly lost sight of the van, but then he saw it drive around the house and through the yard. *Id.* He positioned his car to block the van's exit from the yard and, when the van compensated to avoid him, it ran into the telephone pole. *Id.* Deputy Shanaker positioned his car almost head-on with the van on the opposite side of the pole. *Id.* Deputy Shanaker observed Officer Key running toward the driver's door of the van and Officer Torres running in from behind the van. *Id.*

Anthony Davis was also at the intersection when Officer Torres performed the PIT on the van. Dkt. 44, Declaration of Anthony Davis ("Davis Decl."), Exh. A, Interview of Anthony Davis ("Davis Interview") at 2. Mr. Davis claims that he saw the police lights, pulled over to the curb, and observed the remainder of the pursuit. *Id.* After the van entered the yard, Mr. Davis claims that "the cops blocked" the van in the yard, there was "no route of escape," and two officers ran toward the van, one with his gun drawn. *Id.* at 3.

It is unclear whether the driver of the van was knocked unconscious when the van collided with the telephone pole. Deputy Shanaker claims that, from "the length [of] the hood of [his] car away," it looked like the driver of the van got "knocked out." Shanaker Interview at 3. Officer Key thought that the pursuit was over and "the car was stopped," so when he reached the van, he grabbed the driver's side door handle and tried to open the door. Key Interview at 12-13. At about the same time as Officer Key grabbed the door, the driver put the van in reverse. *Id.* at 13; Shanaker Interview at 4.

Both Officer Key and Deputy Shanaker remember hearing the van's engine rev as it began to move backward away from the pole. The grass was wet and muddy that morning. Key Interview at 19. As a result, the van threw mud forward as the tires spun in reverse. Deputy Shanaker claims that the hood and windshield of his car were sprayed with mud and grass when the van started to spin its front wheels in the yard. Shanaker Interview at 4.

The next significant event was Officer Key falling to the ground. Mr. Davis claims that Officer Key "slipped on the wet grass." Davis Interview at 5. Officer Key claims that he was knocked to the ground by the van when it began to back away from the telephone pole. Key Interview at 13. It is undisputed that the driver accelerated backwards in a counterclockwise arc. The steering wheel was turned to the right so that the front end of the vehicle swung in the direction of the driver's side while the rear of the vehicle swung in the direction passenger side. *See* Fries Decl., Exh 10 (aerial sketch of the path of the van). At this time, Officer Torres claims that he was at the passenger side, middle window of the van with his gun drawn and yelling "show me your hands." Torres Interview at 17. Officer Torres had his left hand on the van and he could feel it moving away from him as the engine revved. *Id*. He could see through the windows of the van that Officer Key went down. *Id*.

Officer Torres claims that his immediate thought was that the front wheels of the van were going to run over Officer Key. He stated that "the front end [of the van] is moving away from me, towards right were [Officer Key] went down." Torres Interview at 18. Officer Torres remembers "thinking [that] the wheels are on top of [Officer Key], spinning. And [he yelled] at [the driver] to stop, and [the driver] just kept going." *Id*. As the van continued arcing backward, Officer Torres saw Officer Key roll out onto the street "curled up, like, in a fetal position." *Id*. at 19. He remembers hearing Officer Key yell and "thought that he was dead." *Id*.

ORDER - 5

Concerned for the safety of both himself and Officer Key, Officer Torres began to fire bullets at the driver. *Id*. at 23. He claims that, "at some point, [he] shot . . . [he] fired at [the driver] to stop him." *Id*. at 18. Officer Torres fired two volleys of bullets. *Id*. at 24. He initially remembered firing four bullets in the first volley, *id*. at 21; it was later determined that he fired seven rounds, Dkt. 25 at 10. He initially remembered firing two bullets in the second volley, Torres Interview at 18; it was later determined that he fired four rounds, Dkt. 25 at 11. There is a dispute as to the effect of the initial volley of bullets.

Officer Torres seems to contradict himself as to why he shot a second volley of bullets. At one point, he describes the situation as follows:

> I thought what happened was I fired four rounds, and he kept going, and he was – and then, I fired . . . made a quick assessment, and he had stopped and I fired . . . I fired two more. That's what I think happened.

Torres Interview at 18. Later in the same interview, Officer Torres describes the situation as follows:

> I remember it was kind of like, you know, I'm shooting . . . I was shooting like this and I came down and he was still looking at me like nothing had happened. And so, then I went back up and I think I fired two more rounds.

*Id*. at 21. The former description can reasonably be read to state that the driver "had stopped and [Officer Torres] fired . . . [he] fired two more" bullets, whereas the latter description states that the initial volley of bullets had no affect on the driver of the van.

Mr. Davis claims that Officer Torres began to fire before Officer Key fell to the ground. Davis Interview at 7. He states that one "officer walked right up to the passenger window and started firing." *Id*. at 4. Mr. Davis also claims that Officer Key fell to the ground because he slipped on the grass, which contradicts the story that the van knocked Officer Key to the ground. *Id*. at 5. Mr. Davis asserts that, after falling, Officer Key "jumped back up" and "jumped out of the way of the car so he wouldn't get ran [sic] over." *Id*. at 3.

Deputy Shanaker claims that the driver was knocked out and came to at the same time that Officer Key reached the driver's side door. Shanaker Interview at 4. He remembers seeing the driver put the van in gear and hearing the engine rev. *Id*. As the van began to move backwards, Deputy Shanaker decided that he should move his car in attempt to block any exit the van may have had from the yard. *Id*. at 7. He "turned around for just a second to make sure [he] was clear in back, because [he] was going to have to back [up] and maneuver" his car to block the van. *Id*. at 4. When he looked back toward the van, he saw Officer Torres with his gun "drawn out" and "he just starts shooting." *Id*. Deputy Shanaker did not see Officer Key. *Id*. Deputy Shanaker claims that Officer Torres was "dumping rounds" as the van was "turning in a big arc backwards." *Id*. at 4-5. After "three to six rounds," Deputy Shanaker could see that the driver was "still animated at that moment . . . [he was] cognizant of what he's doing, and then, it's just like he's not." *Id*. at 4. Then, he saw that the van had "died down in speed" and that the driver was no longer in control of it. *Id*. at 5.

Deputy Shanaker exited his vehicle, approached the driver's side of the van, reached through the driver's side window, and put the vehicle in park. *Id*. at 6. He cuffed the driver and checked for vitals. *Id*. He did not feel a pulse or any breathing. *Id*. The driver was later identified to be Jason Scott Wilkinson. Dkt. 26, Declaration of Stewart Estes, Exh. Q ("Report of Medical Examiner"). Mr. Wilkinson died from "multiple gunshot wounds." *Id*.

Mr. Fries, the accident reconstructionist, claims that tire marks were left in the grass when the van was accelerating in the backwards arc. Fries Decl. ¶ 3(d).

> After about 25-30' of tire marks . . . there is an abrupt difference in the texture and depth of these marks. This indicates that power is no longer being supplied to the wheels. The minivan (an automatic) continues backward at idle leaving light tire marks.

*Id*. ¶ 3(I). Mr. Fries opines as follows:

> The four glass patterns found on the vehicle path are most likely caused by exit bullets going out the driver's side of the vehicle. The glass likely fell to within 1-3 feet from where the bullet penetrated the glass. The

ORDER - 7

> glass pattern indicates three shots were fired after there was no longer power to the minivan.

*Id*. ¶ 3(h); *see also id*, Exh. 13 (aerial view of glass pattern in relation to the van's tire marks and location).

## III. DISCUSSION

### A. Plaintiff's Motions to Strike

Plaintiffs move to strike Defendant Torres' references to Jason Wilkinson's Death Investigation Toxicology Report and to his criminal history. Dkt. 43 at 28. Plaintiffs argue that the legal questions before the Court turn on Officer Torres' knowledge of Mr. Wilkinson when Officer Torres employed force against Mr. Wilkinson. Dkt. 43 at 28-29. Plaintiff concludes that Defendant's reference to the toxicology report and Mr. Wilkinson's criminal history have "no bearing" on the issues before the Court and are used only to "tarnish the character" of Mr. Wilkinson. *Id*.

Defendant counters that "Plaintiff's drug use is relevant to his impaired and erratic driving, as is his criminal history." Dkt. 47 at 3. If Plaintiff's intoxication has any bearing on the questions before the Court, then the Court may consider this evidence. On the other hand, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. " Fed. R. Evid. 404(b). Moreover, Mr. Wilkinson had not been identified when Officer Torres decided to exercise deadly force. For the purposes of this motion, Defendant's reference to Mr. Wilkinson's criminal history is both inadmissible and irrelevant evidence. Therefore, the Court grants Plaintiff's motion to strike Defendant's references to Mr. Wilkinson's criminal history and denies the motion to strike the reference to his toxicology report.

Plaintiff also moves to strike the Declaration of Colleen Lines. Dkt. 49 at 13-14. Ms. Lines asserts that her car was struck by the van during the pursuit. Dkt. 34, ¶¶ 2-3. Plaintiff argues that the question before the Court "centers upon the facts known to [Officer] Torres at the moment he began pulling the trigger" and that Officer Torres does not remember seeing this accident during the pursuit. Dkt. 49 at 13-14. The Court

1 disagrees as only part of the Court's analysis will depend on what Officer Torres saw
2 during the pursuit. Therefore, the Court denies Plaintiffs' motion to strike Ms. Lines'
3 declaration.

**B.  Defendant Torres' Motion to Strike**

Defendant Torres "moves to strike (1) unsworn and unauthenticated report of Matthew Noedel, Ex. 7 to Harlan Dec., Dkt. No. 45; and (2) Notice of Findings as to Officer Rick Torres, Ex. 6 to Harlan Dec., Dkt. No. 45." Dkt. 47 at 1-2.

**1.  Matthew Noedel Report**

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002) (citations omitted). Authentication is a condition precedent to admissibility. *Id*. To authenticate documents that are submitted to support or to oppose a summary judgment motion through personal knowledge, the party must attach the documents to the affidavit of a person through whom the exhibits could be admitted into evidence at trial. *Id*. The affiant must show affirmatively that he has personal knowledge and "is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).

Plaintiff has submitted a "[s]hooting scene examination and reconstruction" report by Matthew Noedel and his curriculum vitae. Dkt. 45-7. Plaintiffs, however, attached these documents to the Declaration of Beau Harlan, Plaintiffs' attorney. *See* Dkt. 45, ¶ 2. Plaintiffs have neither submitted an affidavit of Mr. Noedel nor shown how these documents could be admitted into evidence through Mr. Harlan. Therefore, the Court grants Defendant's motion to strike these documents.

**2.  Notice of Findings**

Authentication is not a condition precedent for domestic public documents under seal. Fed. R. Evid. 902(1). Moreover, public documents are not excluded by the hearsay rule. Fed. R. Evid. 803(8).

Plaintiffs submitted a document titled "Notice of Findings" that was issued under the official seal of the City of Vancouver Police Department and appears to be signed by Assistant Chief Mitch Barker. The Court declines to accept Defendant's argument that this document is unauthenticated hearsay.

Defendant Torres also argues that the contents of the document are irrelevant based on the legal issues before the Court. Dkt. 47 at 2. The document shows that, after an internal investigation, Officer Torres initiated a pursuit of Mr. Wilkinson in violation of department guidelines. *See* Dkt. 45-6 at 3. Defendant asserts that "[w]hether a provision of a policy manual was violated is irrelevant to the question of whether [Mr.] Wilkinson's *constitutional rights* were violated." Dkt. 47 at 2 (emphasis in original). The Court agrees. *See Case v. Kitsap County Sheriffs Dept.*, 249 F.3d 921, 929-30 (9th Cir. 2001). Moreover, based on the record before the Court, the decision on whether to initiate the pursuit is most likely insignificant in light of the decisions regarding whether to end the pursuit. Therefore, the Court grants Defendant Torres' motion to strike the "Notice of Findings" because the finding that Officer Torres violated a department guideline is irrelevant to the questions of constitutional violations and qualified immunity.

**C. Summary Judgment**

Defendants Torres and Key move for summary judgment based on the doctrine of qualified immunity. Dkt. 25; Dkt. 28. Defendant Torres also moves for summary judgment on the grounds that "Plaintiffs parents' claims are not legally viable." Dkt. 25 at 12-33.

**1. Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which

the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

### 2. **Qualified Immunity**

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The immunity is "immunity

from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

In resolving questions of qualified immunity, courts are required to resolve a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the court finds a violation of a constitutional right, "the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case." *Id*. This sequence, however, is no longer the mandatory procedure that a district court must implement when considering the shield of qualified immunity. *See Pearson v. Callahan*, 555 U.S. ___ (January 21, 2009). The district court may "determine the order of decisionmaking that will best facilitate the fair and efficient dispostion of each case." *Id*., slip opinion at 11-17.

### a. Fourth Amendment

Plaintiffs assert that Officer Torres violated Jason Wilkinson's Fourth Amendment right to be free from unreasonable seizure.

### i. Constitutional Violation

Plaintiffs' excessive force claim is governed by the Fourth Amendment because "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). "Under the Fourth Amendment, officers may only use such force as is objectively reasonable under the circumstances." *Boyd v. Benton County*, 374 F.3d 773, 778 (9th Cir. 2004). "Determining whether a particular use of force is reasonable requires the fact-finder to balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Id*. at 778-779. Accordingly, "[t]his balance must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The need for such balancing means that summary judgment in excessive force cases should be

ORDER - 12

granted sparingly." *Id*. Consideration of "reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001).

"The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). However, if "there is probable cause to believe that [a suspect] has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id*. at 11-12. "[W]hen there is objective reason to fear for one's safety . . ., but not one's life, then force short of deadly force might be justified; to justify deadly force, an objective belief that an imminent threat of death or serious physical harm is required." *Price v. Sery*, 513 F.3d 962, 969 (9th Cir. 2008).

In this case, taking the facts in the light most favorable to Plaintiffs, Officer Torres fired three bullets at Jason Wilkinson "after there was no longer power to the minivan." Fries Decl. ¶ 3(h). There at least exists a question of fact whether Mr. Wilkinson posed an "imminent threat of death or seriously bodily harm" when the van stopped accelerating. Further, it is undisputed that when Officer Torres fired, the van was always moving in a backward direction away from Officer Key. Although Defendant Torres argues that "it was obvious to any reasonable person that [the van] would come right back towards Officer Key," Dkt. 47 at 12, the van would have had to avoid both the telephone pole as well as Officer Shanaker's vehicle before it could have threatened Officer Key. Moreover, the record contains evidence that, while Officer Torres was shooting at Mr. Wilkinson, Officer Key had reached his feet and was "out of the way of the car so he wouldn't get ran [sic] over." *See supra*.

Therefore, the Court denies Defendant Torres' motion for summary judgment on the issue of whether his use of deadly force was reasonable. The Court finds that questions of fact exist as to whether Mr. Wilkinson posed an imminent threat throughout the shooting that would justify the use of deadly force.

### ii. Clearly Established Constitutional Right

The next step under *Saucier* in determining if Officer Torres is protected by qualified immunity, is to ascertain if Mr. Wilkinson's constitutional right was clearly established at the time of the injury. *Saucier*, 533 U.S. at 201. In excessive force cases, the inquiry is whether "under the circumstances, a reasonable officer would have had fair notice that the force employed was unlawful, and whether any mistake to the contrary would have been unreasonable." *Boyd*, 374 F.3d at 781; *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003).

When viewing the facts in the light most favorable to Plaintiffs, a reasonable officer would have had fair notice that deadly force was not justified to seize Mr. Wilkinson after the van was no longer under the control of Mr. Wilkinson. The very issues of fact that preclude summary judgment on the constitutional right question also preclude summary judgment on the fair notice question: was it reasonable for Officer Torres to believe throughout the shooting that Mr. Wilkinson posed an imminent threat of death or serious bodily harm? If Officer Torres observed Officer Key jumping up and moving away from the van, then Officer Torres should not have shot at a van moving in the opposite direction. Most importantly, the trier of fact could conclude that Officer Torres shot at the driver of a van that was no longer under power and that a coasting van did not pose a risk of death or serious injury to either Officer Torres or Officer Key.

Therefore, the Court denies Defendant Torres' motion for summary judgment on the issue of whether Officer Torres violated a clearly established constitutional right.

### b. Failure to Intercede

Plaintiffs assert that liability attaches to Officer Key because he "had the ability to intercede and prevent [Officer Torres'] continued use of" force. Complaint, ¶ 7.2. The Supreme Court determined that officers do have a duty to intercede as follows:

> when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety. . . . [An] affirmative duty to protect arises . . . from the limitation which [the state] has imposed on his freedom to act on his own behalf.

*United States v. Reese*, 2 F.3d 870, 887-88 (9th Cir. 1993) (citing *DeShaney v. Winnebago County Dep't. of Soc. Servs.*, 489 U.S. 189, 199-200, (1989)). A "special relationship" which includes a duty to protect arises when the state has taken the person into custody. *Id.* at 888; *Ting v. United States*, 927 F.2d 1504, 1511 (9th Cir. 1991).

In the Rodney King case the Ninth Circuit acknowledged that "[p]ursuant to a long line of civil cases, police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *United States v. Koon*, 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994), *vacated in part on other grounds* by *Koon v. United States*, 518 U.S. 81 (1996). Citing to several out-of-circuit cases, the Ninth Circuit noted that:

> the constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows. Thus an officer who failed to intercede when his colleagues were depriving a victim of his Fourth Amendment right to be free from unreasonable force in the course of an arrest would, like his colleagues, be responsible for subjecting the victim to a deprivation of his Fourth Amendment rights.

*Id.*; *see also Reese*, 2 F.3d at 890 (determining that a defendant officer was liable for not intervening when reasonable steps could have prevented the excessive force, and when the defendant "deliberately chose not to act"). However, "officers can be held liable for failing to intercede *only if they had an opportunity to intercede.*" *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (emphasis added).

Defendant Key argues that Officer Torres did not violate Mr. Wilkinson's constitutional right and, therefore, he had no duty to intercede to prevent the use of

ORDER - 15

1 unreasonable force. Dkt. 28 at 11. The Court, however, has found that there exists
2 material questions of fact regarding whether Officer Torres' use of deadly force violated
3 Mr. Wilkinson's constitutional right to be free from unreasonable seizure. *See supra*.
4 Thus, the Court will only address Defendant Key's argument that he did not have a
5 reasonable opportunity to intercede.

Plaintiffs argue that, taking the facts "in the light most favorable to Plaintiff, [Officer] Key had 'a reasonable opportunity' to stop [Officer] Torres from" using deadly force against Mr. Wilkinson. Dkt. 49 at 13. This conclusion is unsupported by the record. It is undisputed that Officer Key either fell down or was knocked down by the van. It is also undisputed that Officer Key was sprayed with mud from the tires of the van as it accelerated backwards, away from Officer Key. Although the record is unclear as to the period of time that may have elapsed between when Officer Key allegedly reached his feet and when Officer Torres began to shoot at Mr. Wilkinson, it is unreasonable to conclude that, in that period of time, Officer Key should have interceded to prevent Officer Torres from firing his weapon. Moreover, this is not a situation where Officer Key could be considered a tacit collaborator. *See O'Neill v. Krzeminski*, 839 F.2d 9, 12 (2nd Cir. 1988) ("three blows were struck in such rapid succession that [the other officer] had no realistic opportunity to attempt to prevent them."). Officer Torres shot in rapid succession with a short pause between the two volleys of bullets. It is unreasonable to place a duty on Officer Key to assess the situation in that amount of time, conclude that shooting the driver would have been an unreasonable use of deadly force, and then somehow intercede to prevent Officer Torres either from continuing to fire the first volley of bullets or from not firing the second volley of bullets.

Therefore, the Court grants Defendant Key's motion for summary judgment because he did not have a reasonable opportunity to intercede in Officer Torres' use of deadly force against Mr. Wilkinson.

### c. Due Process

Plaintiffs Scott Wilkinson and Alisha White assert that Officer Torres violated their Fourteenth Amendment due process right to associate with their son, Jason Wilkinson. "[A] parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child . . . ." *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991). The Supreme Court has made it clear that only official conduct that "shocks the conscience" is cognizable as a due process violation. *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

In *Lewis*, the Court recognized the police officer's dilemma:

> A police officer deciding whether to give chase must balance on one hand the need to stop a suspect and show that flight from the law is no way to freedom, and, on the other, the high-speed threat to everyone within stopping range, be they suspects, their passengers, other drivers, or bystanders.

*Id*. at 853. In such cases, a plaintiff "must demonstrate that [the officer] acted with a purpose to harm [the suspect] that was unrelated to legitimate law enforcement objectives." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). A purpose to harm may be found in the "rare situations where the nature of an officer's deliberate physical contact is such that a reasonable factfinder would conclude the officer intended to harm, terrorize or kill." *Id*. at 1141 (quoting *Davis v. Township of Hillside*, 190 F.3d 167, 174 (3d Cir. 1999) (McKee, J., concurring)).

The parties do not dispute that this standard of culpability was clearly established at the time of the shooting in 2005. Thus, whether Officer Torres is entitled to qualified immunity on summary judgment turns on whether Plaintiffs can present facts that would justify a jury finding that Officer Torres acted with an unconstitutional purpose to harm Jason Wilkinson. *See Porter*, 546 F.3d at 1140.

Defendant argues that Plaintiffs must show that Officer Torres "intended to harm the parent-child relationship." Dkt. 25 at 32. Defendant concludes that Officer Torres is not liable because Plaintiffs cannot show that he was "aware that Jason Wilkinson had a

relationship with his parents." *Id*. Defendant has provided no binding authority for this proposed element of liability. Neither the Supreme Court in *Lewis* nor the Ninth Circuit in *Porter* included actual knowledge of the parental relationship as an element of the constitutional violation. Defendant's argument is therefore without merit.

Plaintiffs argue as follows:

> Taking the facts in the light most favorable to the plaintiffs, there is no question that Torres acted with the unconstitutional purpose to harm, terrorize and in fact, kill Wilkinson. After Key walked to the front of the minivan and the minivan began to back away from the telephone pole, Key and Torres looked at each other, seemingly acknowledged each other; then Torres walked to the passenger side of the minivan and effectively executed Wilkinson by shooting him eleven times at close range. Torres shot Wilkinson when the minivan was traveling at a slow speed in the exact opposite direction from where Key stood. Even after Wilkinson dropped his hands from the steering wheel and slumped in the driver's seat mortally wounded, Torres continued to fire into Wilkinson as the minivan coasted in reverse.

Dkt. 43 at 27. Based on this version of the events, which is supported by admissible evidence, a reasonable factfinder could conceivably conclude that Officer Torres intended to harm, terrorize or kill Jason Wilkinson and therefore acted beyond the scope of a legitimate law enforcement objective.

Therefore, the Court denies Defendant Torres' motion for summary judgment on Plaintiffs' claim against him for violation of constitutional due process.

## IV. ORDER

Therefore, it is hereby

**ORDERED** that Defendant Torres' Motion for Summary Judgment (Dkt. 25) is **DENIED without prejudice** and Defendant Key's Motion for Summary Judgment (Dkt. 28) is **GRANTED**.

DATED this 23rd day of January, 2009.

BENJAMIN H. SETTLE
United States District Judge

ORDER - 18